**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 17a0358n.06

No. 16-1996

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jun 21, 2017
DEBORAH S. HUNT, Clerk

RON KLOSOWSKI,                                    )
                                                  )
      **Plaintiff-Appellant,**                    )         ON APPEAL FROM THE
                                                  )         UNITED STATES DISTRICT
v.                                                )         COURT FOR THE EASTERN
                                                  )         DISTRICT OF MICHIGAN
CITY OF BAY CITY and JOE LEDESMA,                 )
                                                  )              **OPINION**
      **Defendants-Appellees.**                  )
                                                  )

Before:  DAUGHTREY, MOORE, and GIBBONS, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.**  This case arises out of a conflict between Plaintiff-Appellant Ron Klosowski, a contract bridge tender in Defendant-Appellee City of Bay City, and his supervisor, Defendant-Appellee Joe Ledesma.  The conflict began when Klosowski told the mayor of Bay City that the government could save a considerable sum if it closed two bascule bridges in December, when the Saginaw River freezes over.  Although the mayor and other public officials liked Klosowski's idea, it caused acrimony among the other bridge tenders, who wanted to work through December.  So, Ledesma asked that Klosowski not return the following season.  Unhappy with this decision, Klosowski sued Ledesma and Bay City, claiming that they tortiously interfered with a business expectancy and a contractual relationship. Klosowski also claimed that Ledesma and Bay City violated the First Amendment to the U.S. Constitution and its equivalent under the Michigan Constitution for retaliating against his free expression and were thus liable for damages under 42 U.S.C. § 1983.  The district court found

that Klosowski had not put forth sufficient evidence to support his claims and awarded summary judgment against him on all counts. We hold that the district court correctly awarded summary judgment on Klosowski's tortious-interference claims, but not on his § 1983 claim. Therefore, we **AFFIRM** the judgment as to Counts I through III, **REVERSE** the judgment as to Count IV, and **REMAND** for further proceedings consistent with this opinion.

## I. BACKGROUND

The following facts are cast in the light most favorable to Klosowski, the nonmoving party. *See Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012).

### A. Bay City and Bridge Tenders

Situated in the thenar eminence of the lower Michigan "mitten," Bay City is home to two bascule bridges for the many ships that travel through the Great Lakes. R. 14-4 (Ledesma Dep. at 8) (Page ID #723). Tending these bridges is seasonal work, R. 10-7 (Klosowski Dep. at 44, 233) (Page ID #454, 501), and from 2007 to December 2012, Klosowski tended one of these bridges for various staffing agencies, including a company called ITH Staffing ("ITH"). *Id.* at 29–30 (Page ID #450–51); R. 14-1 (Klosowski Aff. ¶¶ 6, 47) (Page ID #669–70, 673). Although ITH was Klosowski's technical employer, Joe Ledesma, a bridge foreman employed by Bay City, R. 10-2 (Ledesma Aff. ¶ 2) (Page ID #403); R. 30-3 (Bridge Foreman Job Description at 1) (Page ID #1129), "did all of [Klosowski's] scheduling, gave [him] all of [his] assignments, set [his] hours, and did [his] evaluations." R. 14-1 (Klosowski Aff. ¶ 11) (Page ID #670); *see also* R. 10-2 (Ledesma Aff. ¶ 3) (Page ID #403). Nevertheless, in his employment contract with ITH, Klosowski checked off a section of ITH's policy and procedures checklist that stated,

2

"I understand that I am an employee of this staffing company and only I or this staffing company can terminate my employment. When an assignment ends, I must report to staffing company office for my next job assignment." R. 10-6 (Policy and Procedures Checklist ¶ 5) (Page ID #440).

Over the course of his time as a bridge tender, Klosowski's job performance was mixed. Klosowski was a "pro-active employee," R. 14-1 (Klosowski Aff. ¶ 37) (Page ID #673), but had conflicts with Ledesma and at least one other bridge tender. *See* R. 10-2 (Ledesma Aff. ¶¶ 6–14) (Page ID #404–05); R. 10-7 (Klosowski Dep. at 80) (Page ID #463). Nevertheless, by the end of his tenure, Klosowski received top marks in his assignment merit evaluations, including the "personality" category. *See* R. 14-9 (Sept. 7, 2011 Assignment Merit Evaluation) (Page ID #776); R. 14-10 (PERC Merit Report) (Page ID #777) (stating that Klosowski "[h]ad some issues 6-14-11, but once we aired them out Ron is clearly one of our best employees"); R. 14-11 (Dec. 16, 2011 Assignment Merit Evaluation) (Page ID #778); R. 14-7 (Aug. 9, 2012 Assignment Merit Evaluation) (Page ID #774); R. 14-8 (Sept. 27, 2012 Assignment Merit Evaluation) (Page ID #775).

## B. Klosowski's Opinion about December Bridge Closings

At some point, Klosowski came to believe that Bay City was wasting tax dollars to keep the bridges open during the month of December, when the river froze over. In October or November 2012, Klosowski expressed this opinion to Ledesma. R. 14-1 (Klosowski Aff. ¶¶ 20–22) (Page ID #671). Ledesma disagreed with Klosowski, but nevertheless Klosowski persisted. Having "heard about possible firemen and police layoffs," Klosowski "called Mayor Christopher

Shannon, as a concerned taxpayer, in an attempt to save the City of Bay City substantial monies and maintain fire and police protection." *Id.* ¶¶ 23–24 (Page ID #671). Mayor Shannon told Klosowski over the phone that closing the bridges in December was a good idea and asked that Klosowski follow up by e-mail. *Id.* ¶ 25 (Page ID #672); R. 14-12 (Klosowski E-mail to Shannon) (Page ID #779).

Unfortunately, when Klosowski followed up with the mayor, "Ledesma's attitude towards [him] changed for the worse." R. 14-1 (Klosowski Aff. ¶ 29) (Page ID #672). On November 14, 2012, the day after Klosowski e-mailed the mayor, Ledesma told Klosowski that Klosowski should respect the chain of command, rather than air complaints directly to the mayor.[1] R. 14-32 (Klosowski Letter to Shannon at 1–2) (Page ID #853–54). On November 21, 2012, Ledesma informed the ITH office manager that he did not want Klosowski to return the following year. R. 10-14 (Nov. 21, 2012 History Detail Report) (Page ID #579); R. 10-15 (Sowels Dep. at 5) (Page ID #585); Appellant's Br. at 15. Ledesma "made the decision not to return Klosowski based on the history of conflict between he and his fellow Bridge Tenders, his more recent attempts to undermine [Ledesma's] authority, and the unanimous response of his fellow employees who did not want him to return." R. 10-2 (Ledesma Aff. ¶ 26) (Page ID #408); R. 14-4 (Ledesma Dep. at 41) (Page ID #732); R. 10-13 (Harran Dep. at 32) (Page ID #572). On April 5, 2013, as the next season began, ITH informed Klosowski that he would not be called back to Bay City because of "cutbacks in hours and changes in the scheduling." R. 10-

---

[1]The public-works director, who was also present, did not recall this conversation. R. 10-13 (Harran Dep. at 27–28) (Page ID #571).

16 (Apr. 5, 2013 Letter) (Page ID #597). ITH also stated that Klosowski "qualif[ied] for other assignments through ITH Staffing as they become available." *Id.*; R. 10-15 (Sowels Dep. at 42) (Page ID #595). However, believing that ITH was untrustworthy and was lying to him, Klosowski never returned to ITH to seek employment. R. 10-7 (Klosowski Dep. at 126) (Page ID #475).

## C. Procedural History

Klosowski brought this case in state court on August 1, 2013, alleging that Bay City and Ledesma tortiously interfered with a business relationship, tortiously interfered with a contractual relationship, violated Michigan public policy, and violated the Michigan Constitution. R. 1 (Notice of Removal ¶ 1) (Page ID #1–2). After Klosowski amended his complaint to allege that Bay City and Ledesma violated his First Amendment rights as well, the defendants removed the case to the United States District Court for the Eastern District of Michigan. *Id.* ¶¶ 2–6 (Page ID #2). In a series of decisions, the district court awarded summary judgment against Klosowski on all counts. *Klosowski v. Ledesma*, No. 15-10636, 2016 WL 627731 (E.D. Mich. Feb. 17, 2016); *Klosowski v. Bay City*, No. 15-10636, 2016 WL 1106891 (E.D. Mich. Mar. 22, 2016); *Klosowski v. Ledesma*, No. 15-10636, 2016 WL 3213386 (E.D. Mich. June 10, 2016). Klosowski timely appealed the district court's judgment on July 7, 2016. R. 39 (Notice of Appeal) (Page ID #1412).

## II. DISCUSSION

### A. Standard of Review

We apply de novo review on an appeal of a district court's award of summary judgment. *Dye*, 702 F.3d at 294. And, as stated above, we view the facts and inferences drawn therefrom in the light most favorable to Klosowski, the nonmoving party. *See id.* With the facts cast in this light, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### B. Tortious-Interference Claims

The first issue on appeal is whether the district court correctly awarded summary judgment on Klosowski's tortious-interference claims. There are four such claims: (1) tortious interference with a business expectancy against Ledesma, (2) tortious interference with a business expectancy against Bay City, (3) tortious interference with a contractual relationship against Ledesma, and (4) tortious interference with a contractual relationship against Bay City. *See* R. 1-2 (Am. Compl. ¶¶ 47–60 (Page ID #27–29)). We address these claims below with respect to Bay City and Ledesma.

#### 1. Tortious-Interference Claims against Bay City

Klosowski complains about several alleged errors by the district court with respect to his tortious-interference claims against Bay City. He argues that he had a business expectancy with Bay City, not ITH; that the district court improperly accepted Ledesma's affirmative defenses;

that Bay City did not mitigate damages; and that it was reasonable for Klosowski to reject ITH's offer to work elsewhere.

Klosowski's arguments are of no significance, however, because Bay City is immune from tort liability. The district court held that the Governmental Tort Liability Act, Mich. Comp. Laws § 691.1407 (West 2016), immunized Bay City, an issue which Bay City raised in its motion for summary judgment, *see* R. 10 (Defs.' Am. Mot. Summ. J. at 7–8) (Page ID #376–77), and to which Klosowski did not respond, *see* R. 14 (Pl.'s Br. in Opp'n to Defs.' Mot. Summ. J.) (Page ID #632–68). *See Klosowski*, 2016 WL 627731, at *10. Klosowski has also failed to raise the issue on appeal. Because Klosowski did not address the district court's ruling on the Governmental Tort Liability Act either below or on appeal, the issue is forfeited. *Lucaj v. FBI*, 852 F.3d 541, 547 n.4 (6th Cir. 2017). Therefore, the district court's judgment with respect to its dismissal of Klosowski's tortious-interference claims against Bay City is **AFFIRMED**.

### 2. Tortious-Interference Claims against Ledesma

The district court did not err with respect to Klosowski's tortious-interference claims against Ledesma either. Under Michigan law, tortious interference with a business relationship and tortious interference with a contract are separate causes of action with different elements. *Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.*, 706 N.W.2d 843, 848 (Mich. Ct. App. 2005). "The elements of tortious interference with a contract are (1) the existence of a contract, (2) a breach of the contract, and (3) an unjustified instigation of the breach by the defendant." *Id.* at 848–49. The district court properly dismissed Klosowski's claim of tortious interference with a contract because there was no breach of contract. Although at-will contracts

such as Klosowski's are "actionable under a tortious interference theory of liability," *Feaheny v. Caldwell*, 437 N.W.2d 358, 364 (Mich. Ct. App. 1989), Klosowski has not shown that there was a breach of contract in this instance. On the contrary, in his employment contract with ITH, Klosowski checked off a section of ITH's policy and procedures checklist that stated, "I understand that I am an employee of this staffing company and only I or this staffing company can terminate my employment. When an assignment ends, I must report to staffing company office for my next job assignment." R. 10-6 (Policy and Procedures Checklist ¶ 5) (Page ID #440). In this case, although Klosowski "qualified for other assignments" after his assignment with Bay City ended, R. 10-16 (Apr. 5, 2013 Letter) (Page ID #597), he chose not to return for a new assignment, R. 10-15 (Sowels Dep. at 42) (Page ID #595). As we discuss below, Klosowski's reassignment raises First Amendment concerns that survive summary judgment. However, his reassignment does not conflict with the terms of the contract, a precondition to a claim of tortious interference with a contractual relationship. Therefore, Klosowski has not shown that Ledesma tortiously interfered with a contractual relationship. *See Health Call of Detroit*, 706 N.W.2d at 848–49.

Klosowski has not established the elements of a claim of tortious interference with a business expectancy either. "The elements of tortious interference with a business relationship or expectancy are the existence of a valid business relationship or expectancy, knowledge of the relationship or expectancy on the part of the defendant, an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and resultant damage to the plaintiff." *Cedroni Assocs., Inc. v. Tomblinson Harburn Assocs.,*

*Architects & Planners, Inc.*, 821 N.W.2d 1, 3 (Mich. 2012). Klosowski may have expected to maintain the aspect of his business relationship with ITH that would allow him to continue to tend bridges in Bay City. *See* R. 14-1 (Klosowski Aff. ¶¶ 8–12) ("Mr. Ledesma at Bay City did all of my scheduling, gave me all of my assignments, set my hours, and did my evaluations. As far as I was aware the only thing that ITH did was pay us."). However, Klosowski has not established Ledesma's "knowledge of the relationship or expectancy" to tend bridges indefinitely. *See Cedroni Assocs., Inc.*, 821 N.W.2d at 3. Ledesma expressly stated his understanding that Klosowski worked on a temporary basis, not a permanent one. *See* R. 10-2 (Ledesma Aff. ¶ 4) (Page ID #404) ("Klosowski was one of eight persons assigned duties as Bridge Tender through a temporary service provider."). In addition, Ledesma had no reason to believe that Klosowski expected to tend bridges indefinitely: Ledesma worked for Bay City when it transitioned from employing bridge tenders in-house to outsourcing them from staffing agencies. *See* R. 14-4 (Ledesma Dep. at 9) (Page ID #724). Without having shown that Ledesma knew of Klosowski's business relationship or expectancy to tend bridges indefinitely, no reasonable juror could find that Ledesma tortiously interfered with a business expectancy. Therefore, we **AFFIRM** the district court's judgment with respect to both of Klosowski's tortious-interference claims.

## C. Section 1983 Claims

Under § 1983, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution

and laws, shall be liable to the party injured." Klosowski argues on appeal that Ledesma and Bay City restricted his freedom of speech in violation of the First Amendment.[2] We address Klosowski's § 1983 claims with respect to each defendant below.

## 1. Section 1983 Claim against Ledesma

Individuals who violate the Constitution are nevertheless insulated from § 1983 liability if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *See White v. Pauly*, 580 U.S. ——, 137 S. Ct. 548, 551 (2017) (internal quotation marks omitted). Although the district court held that Ledesma violated Klosowski's First Amendment rights, it also held that these rights were not clearly established. *Klosowski*, 2016 WL 627731, at *9–10. It therefore awarded summary judgment in favor of Ledesma. *Id.* at *10. Klosowski argues that the rights at stake were in fact clearly established, and Ledesma argues that they were not. For the reasons that follow, we hold that Ledesma is not entitled to qualified immunity because he violated clearly established law.

### a. Constitutional Violation

As a preliminary matter, Ledesma argues that he did not violate Klosowski's rights because (1) Klosowski was speaking as an employee, rather than a citizen, on matters of public concern and (2) Klosowski did not establish that his interests outweighed those of the government. We hold that there is a genuine issue of material fact on both points.

---

[2]Klosowski has not argued on appeal that his rights were violated under the Michigan Constitution, as he alleged in Count III of his amended complaint. Therefore, we do not address whether Defendants violated Klosowski's rights under the Michigan Constitution.

The key distinction between protected and unprotected speech among public employees is "whether the employee was speaking as a citizen and whether the topic was a matter of public concern." *Boulton v. Swanson*, 795 F.3d 526, 531–32 (6th Cir. 2015). First, we are not convinced by Defendants' argument that Klosowski was speaking as an employee pursuant to his "official responsibilities." *Garcetti v. Ceballos*, 547 U.S. 410, 424 (2006). Defendants are correct that "the First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities." *Id.* "The critical question" in this regard "is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Boulton*, 795 F.3d at 533–34 (quoting *Lane v. Franks*, 573 U.S. ——, 134 S. Ct. 2369, 2379 (2014)).

The answer to that question here is simple: criticizing unnecessary government spending is not "ordinarily within the scope of [Klosowski's] duties," *id.*—his duties were limited to tending bridges, R. 10-7 (Klosowski Dep. at 83–84) (Page ID #464) (describing some of his duties as "mak[ing] sure everything's locked and secure, everything's clean, windows are washed, floor swept"). To be sure, Klosowski's speech stems from his experience as a bridge tender. However, this experience makes him "most likely to have informed and definite opinions as to how funds allotted to the operation of the [bridges] should be spent." *See Pickering v. Bd. of Educ.*, 391 U.S. 563, 572 (1968); *Lane*, 134 S. Ct. at 2377. The First Amendment encourages the expression of these opinions. *Boulton*, 795 F.3d at 534.

We also hold that, at the summary-judgment stage, Klosowski has established that he was speaking on a matter of public concern. So long as a public employee's speech "relates to any

matter of political, social, or other concern to the community at large," it "is properly considered speech on a matter of public concern." *Leary v. Daeschner*, 349 F.3d 888, 899 (6th Cir. 2003) (internal quotation marks and alterations omitted) (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)). Specifically, "speech addresses a matter of public concern when it alleges [inter alia] corruption and misuse of public funds." *Boulton*, 795 F.3d at 532 (citing *Chappel v. Montgomery Cty. Fire Prot. Dist. No. 1*, 131 F.3d 564, 576–77 (6th Cir. 1997)). Ultimately, "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 534 (quoting *Connick*, 461 U.S. at 147–48).

In view of "the whole record" cast in the light most favorable to Klosowski, *id.*, we hold that a reasonable jury could find Klosowski's criticisms of spending on the bascule bridges a matter of public concern. According to Klosowski, Bay City (which has a population of 107,110, *City of Bay City Demographics*, Bay City, Mich., http://www.baycitymi.org/210/City-of-Bay-City-Demographics (last visited Apr. 10, 2017)) lost over $15,360 annually by keeping the bascule bridges open after the river froze over. R. 14-12 (Klosowski E-mail to Shannon) (Page ID #779). "This is not a case where the criticism of minor inefficiencies is held up as a matter of public concern simply because the public fisc is implicated." *Chappel*, 131 F.3d at 579. On the contrary, this is a case where public officials, including the mayor, public-works director, state legislators, and the Coast Guard, actually took an interest in Klosowski's proposal to close the bridges. R. 10-13 (Harran Dep. at 15–16) (Page ID #568). Under these circumstances, and particularly "when the City is trying to save money," R. 14-12 (Klosowski E-

mail to Shannon) (Page ID #779), a reasonable jury could conclude that spending a relatively large sum of money is of public concern. *Chappel*, 131 F.3d at 579 (holding that speech was of public concern when it "addressed a critical revenue-shortfall deriving from a basic failure to collect debts and properly manage the ambulance district's budget").

Finally, summary judgment is not appropriate in deciding whether the government's interests outweigh Klosowski's. Defendants simply have not shown at this juncture in the litigation that their interest in "operating [their] bascule bridges consistent with federal regulation, maintaining an effective temporary work force, and fostering a harmonious work environment," Appellees' Br. at 38, was hampered by Klosowski's speech. Crucially, and as the district court observed, Klosowski's proposal never went into effect for reasons having nothing to do with Klosowski's termination. *Klosowski*, 2016 WL 627731, at *9; R. 10-13 (Harran Dep. at 16) (Page ID #568) (observing that the Coast Guard "just revised the schedule the year before and they weren't willing to reopen, revisit that idea"). Any lingering discord that Klosowski's idea prompted is "speculative" and is thus "insufficient to overcome [Klosowski's] interest in speaking as a private citizen on a matter of public concern." *See Whitney v. City of Milan*, 677 F.3d 292, 298 (6th Cir. 2012).

### b. Clearly Established Right

The next step in analyzing Klosowski's § 1983 claim is whether the above constitutional right was clearly established when Ledesma violated it. In order for a right to be "clearly established," it must be defined in a sufficiently specific manner that "all but the plainly incompetent or those who knowingly violate the law" would understand it. *White*, 137 S. Ct. at

13

551 (internal quotation marks omitted). We hold that Ledesma should have known, based on our decision in *Chappel*, that his interference with Klosowski's employment was unlawful.

The plaintiff in *Chappel* was a part-time emergency medical technician and became concerned "that there were serious problems with the finances and management of the fire and ambulance districts" in his county—serious enough that a new paramedic program (to which he incidentally wanted to apply) was in jeopardy. *See* 131 F.3d at 568. So Chappel contacted several public officials, including the county judge executive, to express his opinion on these issues. The county ultimately created the paramedic program that Chappel wanted, but, when Chappel applied to it, he wasn't hired. The head of the program explained:

> [Chappel's] recent unreasonable and disruptive actions demonstrate that he is not only unreliable but is a threat to the harmonious team atmosphere we are trying to establish.
> In light of his past and current behavior I do not feel that I can permit Mr. Chappel to work under my medical license. Therefore I will not authorize Mr. Chappel to work as a paramedic with the Montgomery County Ambulance Service.

*Id.* at 569.

The case before us tracks *Chappel* closely. Under those circumstances, we held that "Chappel's speech regarding the need for [standard operating procedures in the fire and ambulance districts] and improved training was speech on a matter of public concern." *Id.* at 578. So too was "Chappel's criticism of the ambulance district's financial problems." *Id.* at 579. It was of no moment that Chappel had an ulterior motive to work at the new paramedic program; as we noted then, "[t]he defendants' argument, that Chappel's subjective motivations are dispositive when determining whether his speech address a matter of purely personal concern, is

in direct conflict with the Supreme Court's holding in *Connick*." *Chappel*, 131 F.3d at 574. Rather, in *Chappel* and since, we have "consistently held that speech on the same topics as the report at issue—the efficacy and operations of public agencies and allegations of misconduct by public officials—addresses a matter of public concern." *See Kindle v. City of Jeffersontown*, 374 F. App'x 562, 568 (6th Cir. 2010) (citing, inter alia, *Chappel*, 131 F.3d at 576–77). We hold no differently now. Klosowski, Chappel, and many plaintiffs before them share a concern with their local government's finances and offered solutions to these concerns as private citizens using their experience in public service. It is clearly established that the First Amendment protects such speech, and with the facts cast in the light most favorable to Klosowski, Ledesma should have known that.

Defendants argue in response that Klosowski "does not have a clearly established constitutional right of continued employment," presumably because he is a contractor employed at-will. Appellees' Br. at 39. However, this argument disregards *Board of County Commissioners v. Umbehr*, in which the Supreme Court held that there is no "difference of constitutional magnitude between independent contractors and employees in [the First Amendment] context." 518 U.S. 668, 684 (1996) (internal quotation marks omitted). If anything, Defendants' interest in controlling the speech of contractors is "somewhat less strong" than their interest in controlling the speech of their own employees. *See id.* When the facts are viewed in the light most favorable to Klosowski, Ledesma therefore violated Klosowski's clearly established rights.

### 2. Section 1983 Claim against Bay City

Finally, Klosowski appeals the district court's judgment with respect to his § 1983 claim against Bay City. In addition to individuals, municipalities may be sued under § 1983. *See Monell v. Dep't of Social Services*, 436 U.S. 658, 690 (1978). Such suits may be brought either "where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" or if the constitutional deprivation is "visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.* at 690–91; *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 404 (6th Cir. 2010) (holding that "[a] custom must be so permanent and well settled as to constitute a custom or usage with the force of law" (internal quotation marks omitted)). However, as is often remarked, "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691; *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 n.8 (1986); *Feliciano v. City of Cleveland*, 988 F.2d 649, 654–55 (6th Cir. 1993).

The district court dismissed Klosowski's § 1983 claims against Bay City because "Plaintiff has not identified any Michigan law or any provision of Bay City's Charter suggesting that Ledesma—a bridge foreman—was endowed with final authority to establish any employment policies on behalf of Defendant Bay City." *Klosowski*, 2016 WL 3213386, at *6. On appeal, Klosowski argues that "[t]he district court read[] the 'official policy' as described by the Court in *Pembaur* too strictly" and that Ledesma and Harran, acting as final decision makers,

effected an unconstitutional city policy. *See* Appellant's Br. at 53–59. We hold that Klosowski is correct.

Klosowski has put forth evidence showing that Ledesma was the final decision maker in Bay City with respect to contract workers like Klosowski. The authority to make final policy "can be delegated to [officials] by other officials who have final policymaking authority." *See Feliciano*, 988 F.2d at 655. Ledesma's job description provides that he "[d]irects, and oversees work crews [for the Bridge and Street Departments] including scheduling, timekeeping and support of City policies and procedures." R. 30-3 (Bridge Foreman Job Description at 1) (Page ID #1129); R. 14-4 (Ledesma Dep. at 9) (Page ID #724). Ledesma used that scheduling authority when he decided not to call back Klosowski for the 2013 season. *See* R. 10-2 (Ledesma Aff. ¶ 26) (Page ID #408). Bay City could have, if it chose, regulated the scheduling of contractors itself, much as it does for its own employees via the city manager. *See* R. 30-5 (City Charter § 5.2.c) (Page ID #1139). Instead, it delegated that authority to Ledesma, *see* R. 10-2 (Ledesma Aff. ¶ 26) (Page ID #408), a decision that would subject it to municipal liability if a jury determines that Ledesma's final decision not to call back Klosowski violated the Constitution. Therefore, we **REVERSE** the district court's judgment with respect to the municipal-liability claim.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment as to Counts I through III, **REVERSE** the judgment as to Count IV, and **REMAND** for further proceedings consistent with this opinion.