# STATE OF MICHIGAN

# COURT OF APPEALS

STRATEGY AND EXECUTION INC,

        Plaintiff/Counterdefendant-
        Appellee,

v

LXR BIOTECH LLC,

        Defendant/Counterplaintiff-
        Appellant.

UNPUBLISHED
June 28, 2018

No. 337105
Oakland Circuit Court
LC No. 2015-146756-CK

Before: MURPHY, P.J., and JANSEN and RONAYNE KRAUSE, JJ.

PER CURIAM.

Defendant/counter-plaintiff LXR Biotech LLC (LXR) appeals by right the judgment entered in favor of Plaintiff/counter-defendant Strategy & Execution Inc (SEI), after a jury trial, as well as the trial court's earlier grant of partial directed verdict in SEI's favor. We affirm.

LXR is a manufacturer of energy shots, and SEI is an entity that does sales and marketing. LXR retained SEI to handle its sales and marketing, but for various reasons the relationship broke down. Broadly, SEI contends that LXR breached the parties' contract by failing to pay commissions and a monthly retainer, and further asserts that it was hamstrung in its efforts to perform under the contract by LXR's nonpayment as well as refusal to disclose necessary information or otherwise cooperate. LXR admitted that it failed to make all of its payments, and contends that SEI not only failed to produce promised results, but also breached the contract by failing to meet agreed-upon performance criteria and affirmatively hurt LXR's sales. Additionally, LXR claims SEI attempted to tamper with LXR's management, improperly harassed LXR for information to which it had no right, and interfered in LXR's relationship with a major investor. LXR further stated that its failure to make all of SEI's payments was because SEI essentially caused LXR to be incapable of doing so. The trial court granted a directed verdict in favor of SEI as to LXR's breach of contract claim.

This Court reviews de novo a grant or denial of a motion for directed verdict. *Aroma Wines & Equip, Inc v Columbia Distrib Servs, Inc*, 303 Mich App 441, 446; 844 NW2d 727 (2013). The evidence, and any reasonable inferences therefrom or conflicts in, must be viewed in the light most favorable to the non-moving party, and the motion granted only if there is no factual dispute or reasonable jurors could not differ. *Id*. This Court reviews de novo as a

-1-

question of law the proper interpretation of a contract, including a trial court's determination whether contract language is ambiguous. *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 463; 663 NW2d 447 (2003). This Court reviews de novo a claim of instructional error to determine whether the complaining party was unfairly prejudiced by the omission of any material issues, defenses, or theories supported by the evidence. *Cox v Board of Hosp Managers for City of Flint*, 467 Mich 1, 8; 651 NW2d 356 (2002).

LXR first argues that the trial court erred in granting a directed verdict in favor of SEI on its breach of contract claim. Specifically, it is undisputed that the parties' written contract specified, in relevant part, that "Performance criteria will be added after both parties have had a chance to get familiar with the market and product potential and agree to negotiate in good faith." There is also no dispute that the principals of the parties never both signed a single written document embodying any such criteria. The principal of LXR, Andrew Krause,[1] did write down some performance criteria on a now-lost piece of paper after, he claims, arriving at a verbal agreement with the principal of SEI, Thomas Morse. The existence of the piece of paper itself was corroborated; however, the only other person who claimed to know of it, an attorney who worked for LXR and kept the paper in his office until the paper disappeared, gave conflicting testimony at trial and at his deposition regarding whether performance criteria were ever actually agreed upon by anyone other than Krause alone.

A single party's subjective belief that an agreement was reached is insufficient to establish the requisite "meeting of the minds." *Kamalnath v Mercy Mem Hosp Corp*, 194 Mich App 543, 548-549; 487 NW2d 499 (1992). Nonetheless, a suspiciously improbable case is usually not justification for depriving the jury of its role as the evaluator of witnesses' credibility. *Caldwell v Fox*, 394 Mich 401, 407; 231 NW2d 46 (1975). However, there *may* be exceedingly unusual cases where a witness's testimony is not in fact sufficient to create a genuine question of fact, generally where a witness has a non-trivial interest in the outcome and the testimony is in some way additionally improbable because it is self-contradictory, contravenes physical laws or incontrovertible other evidence, or is based on doubtful memory and departs from an overwhelming accumulation of other evidence. See *Krisher v Duff*, 331 Mich 699, 709-710; 50 NW2d 332 (1951); *Wingett v Moore*, 308 Mich 158, 161; 13 NW2d 244 (1944); *Grace Harbor Lumber Co v Friedman*, 277 Mich 202, 211; 269 NW 144 (1936).

It is inescapable that Krause is a highly interested witness with every motive to prevaricate, although that does not make him a particularly unusual witness in this matter. However, by his own testimony he was in the habit of routinely lying to Morse, which he seemingly believed was simply good business practice. His testimony also featured a noteworthy disinclination to provide direct answers to questions. LXR relies on emails to show that there had been an agreement as to performance criteria, but all the emails appear to show is that the parties discussed proposals for performance criteria. Voluminous email communications were admitted, and LXR apparently deemed performance criteria of great importance. Therefore, we find it beyond merely implausible that the purported oral agreement Krause

---

[1] No relation to any judge on this panel.

described would not have been expressly memorialized or referenced in *some* written and retained document attributable to principals from both parties. All other things being equal, "absence of evidence is not evidence of absence." *In re Rail Freight Fuel Surcharge Antitrust Litigation*, 725 F 3d 244, 254 (CA DC, 2013). However, all other things are not equal where it is inconceivable that, if any such agreement existed, written evidence of the agreement would not be found.

The trial court ruled that the jury could not reasonably find that a specific agreement on performance requirements was ever agreed upon, because "both parties kind of dropped the ball." We agree with the trial court that this is one of the exceedingly rare cases in which a witness's testimony is insufficient to create a jury question. We also note that even though our review of a trial court's decision on a motion for directed verdict is de novo, the trial court's superior vantage point of the evidence and the case encompasses more than just the demeanor and credibility of the witnesses, and so if the question is a close one, we give deference to the trial court to some degree. See *Om-El Export Co v Newcor, Inc*, 154 Mich App 471, 480; 398 NW2d 440 (1986). We therefore affirm the trial court's grant of directed verdict in favor of SEI.

That being the case, LXR argues in the alternative that if no performance criteria were agreed upon, the entire contract is void, and thus SEI's claim for breach of that contract must also be invalidated. SEI points out, accurately, that LXR did not raise this issue in the trial court; however, the gravamen of LXR's argument is that the trial court's determination has automatic and inescapable legal consequences. This is at least arguably an exception to a finding or decision made by the trial court, MCR 2.517(7), and is in any event "a question of law and the facts necessary for its resolution have been presented." *Steward v Panek*, 251 Mich App 546, 554; 652 NW2d 232 (2002). We find the issue appropriate for our review. However, we disagree with LXR's substantive argument.

Primarily, LXR fails to recognize that the parties did in fact arrive at a meeting of the minds on July 24, 2014, to, *inter alia*, add performance criteria at a later date, specified in ¶ 9 of their contract. Leaving matters open to future negotiation can be evidence that the parties did not intend to enter into a contract at that time, but does not prove it. *Opdyke Investment Co v Norris Grain Co*, 413 Mich 354, 359-360; 320 NW2d 836 (1982). It is true that if any individual term in a contract is invalid, that will invalidate the entire contract if the terms "are interdependent and common to one another and to the consideration." See *City of Lansing v Lansing Twp*, 356 Mich 641, 658; 97 NW2d 804 (1959). However, LXR does not make the argument that the parties somehow never agreed to ¶ 9, or that ¶ 9 fails to specify all of its own material terms. See *Heritage Broadcasting Co v Wilson Communications, Inc*, 170 Mich App 812, 819; 428 NW2d 784 (1988). Rather, LXR makes the peculiar argument that either a contract to make a contract is intrinsically invalid, which is flatly incorrect, or that if the parties never carried out the requirements of ¶ 9, the entire contract is therefore void.

First, it is clear from the testimony of both Krause and Morse that each of them believed ¶ 9 to have been agreed to and binding. They simply accused the other of dragging their feet in actually carrying out its requirements. Neither expressed confusion about what it called for. Leaving aside the fact that it is usually for the jury to decide whether a meeting of the minds occurred, the evidence was simply uncontested that there was a meeting of the minds. If the parties understood ¶ 9 to completely specify all of its own material terms for when and how the

performance criteria should be determined, but they failed to carry out the terms of ¶ 9, then at most one or the other of them would have a claim for breaching a contract to make a contract. *Heritage Broadcasting Co*, 170 Mich App at 819. LXR does not argue that ¶ 9 was incomprehensible or incomplete, but rather only that if the parties never complied with it, the entire contract falls apart. This is incorrect: it simply means LXR could, at least in theory, have argued that SEI breached the contract by failing to agree to performance criteria.

We note that ¶ 9 is clear about what the parties are to do, but is somewhat vague as to timing. However, it does specify conditions precedent to the future agreement, so it is not outright devoid of any timing requirements. In any event, LXR argues that it is invalid for calling for a future agreement, *per se*. The fact that a term in the parties' agreement requires them to arrive at another agreement in the future does not invalidate the contract itself and is not itself an unenforceable term. It appears that ¶ 9 specifies what the parties are to do and when they are to do it, which should constitute all essential and material terms in the absence of some articulated reason why it does not. There was no dispute that the parties believed they had entered into a valid and binding contract. If the parties failed to make the agreement as dictated, then either or both of them might have a claim for a breach of ¶ 9, but that does not render the contract void in its entirety. We disagree with LXR's argument that SEI's breach of contract claim fails on the basis that the entire contract was void.

LXR next argues that the trial court erred in refusing to give a requested instruction to the jury pertaining to "procuring cause." Generally, LXR argues that in the absence of a specific contractual right to do so, sales representatives are only entitled to commissions after the termination of a contract if the sales representatives are the "procuring cause" of any sales upon which such commissions could be based. See *Reed v Kurdziel*, 352 Mich 287, 294-295; 89 NW2d 479 (1958). LXR points out that the parties' contract does not include any extraordinary right to post-termination commissions. We agree. However, the gravamen of SEI's argument is that the contract was not properly terminated according to its terms, so it renewed automatically, and SEI only sought commissions during that renewed contract term, not commissions from after the contract terminated by SEI's reasoning.

We certainly take note that the parties' contract is not a model of elegance. LXR correctly points out that the automatic-renewal term of the contract (as well as the 90-day notice to cancel term) is buried in the middle of a contract term that otherwise only addresses SEI's $20,000 a month retainer. LXR is also correct in stating that as a general proposition, the last-antecedent rule would restrict the renewal provision to apply only to the retainer. See *Sun Valley Foods Co v Ward*, 460 Mich 230, 237; 596 NW2d 119 (1999) (discussing interpretation of statutes). However, LXR ignores the far more general principle that such "rules" of construction are merely guidelines subject to any clear intention to the contrary discernable from the contract as a whole. *Detroit Trust Co v Manilow*, 272 Mich 211, 218; 261 NW 303 (1935). Given the obviously haphazard assembly of the parties' contract, and SEI's inescapably obvious argument that it would be absurd for the parties to have intended a situation under which SEI's retainer fee entitlement would renew but its obligations would not, especially given the fact that LXR never even made this argument below, we reject a hypertechnical perversion of the parties' clear intent.

That being the case, the date upon which the parties' contract terminated was explicitly put to the jury. SEI made the express argument to the jury that if the contract was not terminated

properly according to its terms, it renewed automatically, and that LXR had failed to terminate the contract properly. LXR, in contrast, argued to the jury that the evidence showed that the contract had already been terminated long before Krause instructed SEI to cease and desist from further activities. We think it would have been better had the trial court explicitly told the jury that they were to make a determination of when the contract terminated, if at all. However, it is clear from the closing arguments, which were cogent and expeditious, that the jury would have been aware that this determination was an essential part of what the jury needed to decide. By necessary implication, the jury found that the parties' contract renewed and was still in effect through July of 2016. Because SEI sought no commissions beyond that date, no "procuring cause" instruction was necessary. Similarly, there is no need to consider whether the contract provided for post-termination commissions. The trial court did not err in declining to give a "procuring cause" instruction.

Finally, LXR argues that the trial court should have granted it a new trial on its claim for tortious interference. Generally, LXR argues that it and SEI were in a fiduciary relationship. LXR alleges that Morse told a major investor that Krause was working against its interests and suggested that Krause was not merely incompetent but deceitful, Morse sought to take over LXR, Morse divulged confidential information to outside entities, Morse planned to force LXR into involuntary bankruptcy, and Morse attempted to undermine LXR's new sales director. As a consequence, the investor decided not to make a new three to five million dollar investment in early 2015. We disagree.

This Court has explained:

> The elements of tortious interference with a business relationship are the existence of a valid business relationship or expectancy, knowledge of the relationship or expectancy on the part of the defendant, an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and resultant damage to the plaintiff. [*BPS Clinical Laboratories v Blue Cross and Blue Shield of Michigan*, 217 Mich App 687, 698-699; 552 NW2d 919 (1996).]

Actions "motivated by legitimate business reasons" do not constitute an improper motive, *BPS Clinical Labs*, 217 Mich App at 699. LXR correctly points out that a desire to profit is not an end that justifies any means. *Jim-Bob, Inc v Mehling*, 178 Mich App 71, 96-97; 443 NW2d 451 (1989). It would therefore be more accurate to say that the existence of legitimate business reasons will not necessarily immunize a party from a claim of tortious interference, but the plaintiff is nevertheless obligated to show that the defendant had at least one motive that was improper. *Dalley v Dykema Gossett*, 287 Mich App 296, 323-324; 788 NW2d 679 (2010); see also *Woody v Tamer*, 158 Mich App 764, 773-775; 405 NW2d 213 (1987) (discussing tortious interference with a contract). Also of note, any such business relationship must be real or reasonably likely, not merely wishful thinking. *Cedroni Ass'n, Inc v Tomblindon, Harburn Assoc, Architects & Planners Inc*, 492 Mich 40, 45; 821 NW2d 1 (2012).

It must be emphasized again that there was a jury verdict on this issue. A trial court's decision on a motion for a new trial, premised on the argument that the verdict was against the great weight of the evidence, is reviewed for an abuse of discretion. *Bosak v Hutchinson*, 422

Mich 712, 737; 375 NW2d 333 (1985). Exactly what that means is somewhat nebulous. *Arrington v Detroit Osteopathic Hosp Corp*, 196 Mich App 544, 550-561; 493 NW2d 492 (1992). However, it is amply clear that the trial court may not invade the role of the jury, and this Court is limited in the extent to which it may second-guess the trial court's conclusion. *Id*. In effect, we are required to give a significant degree of deference to the trial court, which in turn is required to give a significant degree of deference to the jury. The question before us is not whether a jury could reasonably find in LXR's favor. Rather, the question is essentially whether it was *un*reasonable for the jury *not* to find in their favor.

As an initial matter, the testimony made it clear that the major investor's initial large investment into LXR was a matter of nepotism and a return of a favor, and at best the investor had a vague expectation of competence based on knowledge of some of Krause's blood-relatives. This somewhat reduces the importance of any descriptions Morse may have given of Krause as a less than excellent businessperson. Furthermore, the investor's representative who testified at trial was evasive about what its intentions had been at the relevant time, but expressly denied that the description Morse gave about the situation at LXR, whatever it was, had been the reason why the investor decided not to make an investment at that time. Furthermore, much of the alleged wrongful conduct by SEI appears to be more a matter of either a personal vendetta by Morse against Krause or personal paranoia by Krause about Morse; or possibly both. In any event, even if Krause expected to receive more money, much of the alleged wrongful conduct by Morse apparently occurred *after* the investor decided not to offer LXR further funding, and *before* the investor decided that it would offer further funding after all. Otherwise, there was simply conflicting testimony about who knew what, why Morse sought out the investor, whether there were ever any serious plans to place LXR into involuntary bankruptcy, who was behind any such plans, and generally anything else of conceivable relevance.

We do not doubt that the jury could have found in LXR's favor. However, it is clear that there was also ample evidence from which the jury could reasonably find that any business expectancy was wishful thinking on the part of LXR, that Morse had no meaningful effect on the investor's decision whether to fund LXR at any particular time, or that Morse had no improper motives in whatever conduct he undertook. We do not find that it was "outside th[e] principled range of outcomes," *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003), for the trial court to determine that the jury's verdict was against the great weight of the evidence.

Affirmed.

/s/ William B. Murphy
/s/ Kathleen Jansen
/s/ Amy Ronayne Krause

-6-